UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SUSAN DENISE HOLDER,

      Plaintiff,

v.                                    CASE NO. 3:18-cv-129-J-MCR

ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision denying her applications for a period of disability, disability insurance

benefits ("DIB"), Supplemental Security Income ("SSI"), and disabled widow's

benefits.  Following an administrative hearing held on January 25, 2017, the

assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not

disabled from February 24, 2011, the original alleged disability onset date,[2]

through February 14, 2017, the date of the decision.[3]  (Tr. 9-28, 35-84, 326, 330.)

---

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Doc. 13.)

[2]  On the date of the hearing, Plaintiff amended her onset date to December 28,
2012, but the ALJ's decision does not reflect the change.  (Tr. 34.)

[3] Plaintiff had to establish disability on or before September 30, 2017, her date
last insured, in order to be entitled to a period of disability and DIB.  (Tr. 12.)  Further, in
order to be entitled to a disabled widow's benefits, Plaintiff had to establish that her
disability began on or before May 31, 2020.  (Tr. 13.)

Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED** and **REMANDED**.

## I.    Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff raises two issues on appeal.  First, she argues that the ALJ failed to articulate good cause for rejecting the treating opinion of Dr. Braeutigam and also failed to properly evaluate Dr. Choisser's consultative opinion.  Second, Plaintiff argues that the ALJ failed to articulate good cause for rejecting Dr. Menges's treating opinion and failed to properly analyze Dr. Knox's opinion that Plaintiff also suffers from borderline personality disorder or reconcile the conflicts between Dr. Knox's opinions and the ALJ's mental residual functional capacity ("RFC") assessment.  Defendant responds that the ALJ properly evaluated the medical opinions of record and that substantial evidence supports the ALJ's conclusions.

### A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3)

treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). "However, the ALJ is not required to explicitly address each of those factors. Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. June 22, 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam), 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, *2 (11th Cir. Mar.

9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. May 2, 2008) (per curiam); *see also* SSR 96-6p[4] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

## B. The ALJ's Decision

At step two of the five-step sequential evaluation process, the ALJ found that Plaintiff had the following severe impairments: obesity, hypertension, diabetes mellitus with neuropathy, bipolar disorder, cervical disc disease, lumbar disc disease, fibromyalgia, migraine headaches, osteoarthritis of the knees, depressive disorder, and anxiety disorder. (Tr. 15.) Then, after considering the medical evidence and opinions of treating, examining, and non-examining sources, the testimony at the hearing, and other relevant evidence in the record,

---

[4] SSR 96-6p was rescinded and replaced by SSR 17-2p effective March 27, 2017.

the ALJ found that Plaintiff had the RFC to perform "less than the full range of

light work," as follows:

> The claimant can lift 20 pounds occasionally and ten pounds
> frequently.  The claimant can sit six hours, stand six hours, and walk
> six hours in an eight-hour workday.  The claimant can push and pull
> as much as [s]he can lift and carry.  The claimant requires a sit/stand
> option that allows for a change of position at least every 30 minutes,
> which is a brief positional change lasting no more than three minutes
> at a time where the claimant remains at the workstation during the
> positional change.  The claimant can occasionally use foot controls
> and hand controls.  The claimant can occasionally reach overhead
> and frequently handle, finger, and feel.  The claimant can frequently
> balance, stoop, and crouch; occasionally kneel and climb stairs or
> ramps; and never crawl or climb ladders and scaffolds.  The claimant
> should have no exposure to unprotected heights, moving mechanical
> parts, extreme cold, or extreme heat.  The claimant is limited to
> simple tasks and simple work-related decisions.  The claimant can
> occasionally interact with supervisors, co-workers, and the public.
> The claimant will be off task up to 10% of the eight-hour workday.

(Tr. 17.)

> The ALJ explained:

> After considering the record in its entirety, the undersigned finds that
> the evidence of record does not establish that the claimant's
> impairments are disabling in nature or prevent her from performing
> work in accordance with the [RFC] assessment.  The claimant's
> complaints appear overstated compared to the physical examination
> findings.  While examinations have shown reduced and painful
> cervical and th[o]racolumbar range of motion, she has retained
> normal strength, normal coordination, and normal sensation.
> Examinations largely show full range of motion of the upper and
> lower extremities (Exhibits 2F, 6F, 8F, and 17F).  Treatment records
> from Coastal Spine and Pain Center also show that she had a good
> response to treatment and do not indicate that she was ever referred
> for surgical evaluation.  She was referred for physical therapy, but
> records do not indicate that she ever follow[ed] up on this
> recommendation.  In addition, the record documents that she was

able to take an extended trip to Kentucky to help a friend and that she was able to go without treatment during this duration (Exhibit 8F). As to her mental impairments, treatment records show little treatment, a good response to treatment, and fairly normal mental status examinations. Thus, the claimant's allegations are inconsistent with the evidence of record.

(Tr. 24.)

The ALJ also addressed, *inter alia*, the Physical RFC Questionnaire by Dr. Braeutigam; the consultative physical examinations by Dr. Choisser, Dr. McCormick, and Dr. Martin; the treatment records, the Mental RFC Assessment, and the Psychiatric Review Technique ("PRT") by Dr. Menges; and the two consultative psychological examinations by Dr. Knox. (Tr. 19-24.) The ALJ gave little weight to the Physical RFC Questionnaire completed by Plaintiff's primary care physician, Dr. Braeutigam. (Tr. 25.) The ALJ explained:

Dr. Braeutigam's treatment records are handwritten and are largely illegible (Exhibit 4F, 7F, and 13F); however, his opinions are not consistent with the physical examination finding contained in the entire record or the claimant's course of treatment. As noted above, physical examinations have shown intact strength, intact sensation, normal coordination, no neurological deficits, and normal range of motion of the upper and lower extremities.

(*Id.*) Similarly, the ALJ gave little weight to Dr. Choisser's opinion, stating that "[n]either Dr. Choisser's physical examination, nor the examinations of record, warrant limitation to sitting only two hours a day and standing/walking two hours a day, total." (*Id.*)

As to the opinion of Dr. Krishnamurthy, the ALJ stated:

[T]he State agency medical consultant opined that the claimant could perform light work with postural and environmental limitations (Exhibits 10A, 16A, and 17A). The undersigned accords great weight to this opinion, as it is consistent with the examination findings showing normal strength and sensation, and full range of motion of the extremities, as well as with the claimant's course of treatment. However, in light of her knee osteoarthritis, neuropathy, and obesity, the undersigned further finds that she should only occasionally operate foot controls. In light of her cervical disc disease, the undersigned finds that she should only occasionally reach overhead, frequently handle, finger, and feel, and occasionally operate hand controls. Due to her combination of impairments, the undersigned finds that she requires a sit/stand option.

(*Id.*)

The ALJ then addressed the opinion evidence pertaining to Plaintiff's

mental limitations:

The State agency psychological consultants opined that the claimant had severe mental impairments, but ha[d] the ability to understand and remember simple and detailed instructions; maintain attention and concentration for periods of at least two hours duration; [might] have occasional interruptions from psychologically based symptoms, but ha[d] the ability to complete a normal workday and workweek without an unreasonable number and length of rest periods; ha[d] the ability to relate adequate[ly] to peers and supervisors for brief periods; ha[d] the ability to adapt to routine changes in the workplace (Exhibits 1A, 2A, 3A, 10A, 16A, and 17A). The undersigned gives great weight to these opinions, as they are supported by the mental status examinations of Dr. Knox and Dr. Menges.

Little weight is given to the opinions of Dr. Menges, as they are not supported by his examination findings, which showed intact cognition, appropriate appearance, normal speech, fair to good insight and judgment, clear sensorium, a cooperative attitude and behavior, and no potential for suicide (Exhibits 10F and 16F). Nor are his opinions consistent with the normal mental status examination findings by Dr. Knox.

(*Id.*)

The ALJ concluded that Plaintiff was unable to perform any past relevant work, but was able to perform other jobs existing in significant numbers in the national economy, such as a route clerk, a blade balancer, and an egg candler. (Tr. 25-27.)

### C.    Relevant Evidence of Record

#### 1.    Treating Sources

##### a.    James T. Menges, M.D.

On June 21, 2016, Dr. Menges completed a Mental RFC Assessment.  (Tr. 698-99.)  He opined that Plaintiff was severely limited in the ability to: understand and remember very detailed instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and travel in unfamiliar places or use public transportation.  (*Id.*)

He also opined that Plaintiff was markedly limited in the ability to:

understand and remember very short and simple instructions; carry out short and simple instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazzards and take appropriate precautions; and set realistic goals or make plans independently of others.  (*Id.*)  Further, Plaintiff was moderately limited in the ability to: remember locations and work-like procedures, and ask simple questions or request assistance.  (*Id.*)

On July 15, 2016, Dr. Menges completed a PRT, assessing Plaintiff's condition from February through June 2016.  (Tr. 717.)  Dr. Menges indicated that Plaintiff met listings for psychotic and affective disorders, as evidenced by flat or inappropriate affect, appetite and sleep disturbance, decreased energy, thoughts of suicide, etc.  (Tr. 719-20, 728.)  He noted that there was a residual disease process that had resulted in such marginal adjustments that even a minimal increase on Plaintiff's mental demands or change in her environment would be predicted to cause her to decompensate.  (Tr. 728.)  Dr. Menges opined that Plaintiff was markedly/severely limited in maintaining concentration, persistence, or pace; and moderately limited in activities of daily living, in maintaining social functioning, and in repeated episodes of decompensation, each of extended duration.  (Tr. 727.)

On January 24, 2017, Dr. Menges wrote a letter, enclosing a copy of his Mental RFC Questionnaire and PRT of July 15, 2016, and stating that Plaintiff's limitations were the same or more severe than those set forth in his earlier opinion and that these limitations applied as of February 24, 2011.  (Tr. 751.)

### b.    Kent Braeutigam, D.O.

On August 8, 2016, Dr. Braeutigam completed a Physical RFC Questionnaire, noting that he had been seeing Plaintiff since 2006, four to six times a year, and that her symptoms included chronic pain, fatigue, and memory issues.  (Tr. 731-35.)  He opined that Plaintiff's impairments had lasted or could be expected to last at least twelve months, and her symptoms and limitations applied as of February 24, 2011.  (Tr. 731.)  Dr. Braeutigam also opined that Plaintiff's depression and anxiety were affecting her physical condition, she was incapable of even "low stress" jobs, and her symptoms were severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks.  (Tr. 731-32.)

He further opined that Plaintiff could sit for ten minutes and stand for ten minutes at one time; she could sit for less than two hours and stand/walk for less than two hours total in an eight-hour workday; she needed periods of walking around during an eight-hour workday – specifically, every ten minutes for eight minutes each time; she needed a job that permitted shifting positions at will from sitting, standing, or walking; she would need unscheduled breaks (of ten minutes

each) during an eight-hour workday; she could lift ten pounds occasionally and less than ten pounds frequently; she could frequently look down, turn her head right or left, look up, and hold her head in a static position; she could occasionally stoop, rarely twist or climb stairs, and never crouch/squat or climb ladders; she could not reach overhead; and she was likely to be absent from work as a result of her impairments or treatment more than four days per month.  (Tr. 732-34.)

### 2. Examining Sources

#### a. Peter Knox, M.Ed., Psy.D.

On July 17, 2013 and December 15, 2014, Dr. Knox performed a mental status examination of Plaintiff.  (Tr. 407-12.)  On both occasions, Plaintiff's "mood appeared dysphoric and she had a blunted affect with a forced smile."  (Tr. 410, 449.)  Plaintiff "could relate information in a rational, coherent, and sequential fashion until [they] discussed her diagnosis which got her rambling in her thought process."  (*Id.*)  Dr. Knox observed that Plaintiff "did have a problem ambulating, as she ha[d] trouble with rolling in her hips with her weight issues."  (Tr. 411, 449.)  He noted that Plaintiff was "not capable of managing her own funds" based on her report that she spent money foolishly.  (*Id.*)  Based on Plaintiff's complaints of thoughts of self-harm and mood swings, she was diagnosed with bipolar disorder.  (Tr. 412, 450.)  She was also diagnosed with borderline personality disorder due to her low self esteem and history of dysfunctional relationships.  (*Id.*)  Her GAF score was 50.  (Tr. 412, 451.)

### b.     Timothy J. McCormick, DO, MPH

Dr. McCormick examined Plaintiff and issued a consultative report on

September 24, 2013.  (Tr. 414-17.)  Under History, Dr. McCormick stated, in part:

> Diabetes- examinee reports treatment with pills and insulin.  Blood
> sugars are checked 2-3 times a day.  She reports they run typically
> in the 200 range.  With regard to hand or foot problems for diabetic
> neuropathy, her response is that her feet are very sensitive to touch
> complaining that they are painful. . . .
>
> Neck pain- examinee reports she has degenerative arthritis in her
> neck.  This was seen on MRI imaging. . . . She reports she has
> migraines and severe headaches that occur on a daily basis. . . .
> Lights and sounds bother her, and she has nausea associated with
> those headaches as well.
>
> Low back pain- she reports she is receiving shots now into her back.
> She was told that one of the bones has slid forward and now it is
> bone on bone.  MRIs were done at Coastal Spine.  She reports
> treatment there has been with pain medication injections.  She
> reports the injections have only provided her temporary relief.
>
> Hip pain- she reports both hips bother her with pain and stiffness.
> She complains of difficulty sleeping and reports every 45 minutes to
> an hour or so she needs to change positions due to discomfort.  Her
> hips have not been x-rayed.
>
> Knee problems- both knees bother her, right worse than the left.
> She complains that she has swelling about the knees.

(Tr. 414-15.)

On examination, Plaintiff had hand tremors, tenderness at the left knee at

the tibial plateau, and midline hernia.  (Tr. 416.)  The straight leg raising was 90

degrees in the seated position and 45 degrees in the supine position.  (Tr. 416.)

The rest of the examination was unremarkable.  (Tr. 415-16.)  In summary, Dr.

13

McCormick stated: "The examinee presents with several health problems as described.  She was noted to have a hand tremor.  She has some joint enlargement and tenderness in the left knee.  Range of motions were otherwise full."  (Tr. 417, 418-20.)

### c.     Robert Martin, M.D.

On January 5, 2015, Dr. Martin performed a consultative examination of Plaintiff.  (Tr. 454-60.)  Plaintiff reported being on Methadone for 14 years due to lower back pain, but was rapidly tapered off a few months previously, with severe pain lasting a couple of months, for which she reported occasional use of Hydrocodone.  (Tr. 454.)  Plaintiff also reported fatigue, headaches, lower extremity edema, shortness of breath, incontinence, altered mental status, muscular weakness, joint pain, muscle pain, limitation of motion, back pain, anxiety, and depression, among others.  (Tr. 455.)

On examination, Plaintiff was "morbidly obese" and had "diffuse tenderness everywhere," "sensation with diffuse hyperalgesia at every contact point[,] including points not associated with fibromyalgia," "hyperalgesia of the plantar right foot diffusely," and "wide-based gait" (it was unknown whether this was secondary to morbid obesity or neurologic dysfunction).  (Tr. 455-57.)  She was unable to perform "heel-to-toe straight line walking . . . with inability to balance on either leg."  (Tr. 457.)  She had reduced range of motion of the cervical spine upon extension and lateral flexion, and the lumbar spine upon forward flexion and

extension.  (Tr. 458.)

Dr. Martin diagnosed, *inter alia*, an anxiety disorder, arthritis, bulging disk without myelopathy, depressive disorder, diabetes mellitus type two, and fibromyalgia (suspected hypoalgesia diffusely from the prolonged use of opioids). (Tr. 457.)  Dr. Martin noted that there had been little or no change in Plaintiff's activities of daily living over the past twelve months.  (*Id.*)

### d.    William V. Choisser, M.D.

On January 10, 2017, Dr. Choisser reviewed medical records,[5] performed a physical examination of Plaintiff, and completed a Physical RFC Questionnaire. (Tr. 744-49.)  On examination, Plaintiff's cervical rotation was reduced to 45 degrees in either direction and flexion and extension were limited to 30 degrees due to pain and spasm.  (Tr. 745.)  Plaintiff had only 90 degrees of flexion in both hips because of back pain.  (*Id.*)  Her straight leg raising test was positive at 45 degrees in each leg.  (*Id.*)  She had mild resting tremors in both hands.  (*Id.*)  Her gait appeared fairly normal.  (*Id.*)  Her back flexed 45 degrees before she had too

---

[5] The records he reviewed included: Dr. Knox's June 2013 and December 2014 reports; Dr. McCormick's September 2013 report; the records from Shands Jacksonville dated April 14, 2014; the records from Family Medical and Dental for the period January 7, 2013 to July 11, 2014; Dr. Martin's January 5, 2015 report; the records from Family Medical Center Middleburg for the period January 7, 2013 to January 20, 2015; the records from Coastal Spine and Pain Center for the period June 17, 2013 to February 9, 2015; the records from Clay Behavioral Health Center for the period February 12, 2016 to March 11, 2016; the records from St. Vincent's Center Clay County for the period February 2, 2015 to March 12, 2016; Dr. Menges's records from June 21, 2016 and July 15, 2016; and Dr. Braeutigan's records from June 1, 2015 to June 27, 2016 and August 8, 2016.  (Tr. 744.)

much pain and spasm in the low lumbar area and her squat was limited to one half the distance to the floor.  (*Id.*)  Her right knee jerk and right ankle jerk were absent.  (*Id.*)  Dr. Choisser diagnosed poorly controlled adult onset diabetes, hypertension uncontrolled on the examination, bipolar depression and anxiety, and chronic severe back pain with sciatica.  (Tr. 745-46.)

Dr. Choisser's prognosis was poor.  (Tr. 746.)  In the Physical RFC Questionnaire,[6] he noted that Plaintiff's symptoms included back pain (day and night) and sciatica greater on the right than the left leg, caused by degenerative joint disease of the cervical and lumbar spine.  (*Id.*)  He noted Plaintiff's reduced range of motion, positive straight leg raising test, and lack of reflexes in the right leg as the bases for his opinions.  (*Id.*)  He also identified Plaintiff's tremors, likely due to taking Effexor, as possibly affecting her ability to work.  (*Id.*)

Dr. Choisser opined that Plaintiff's impairments had lasted or could be expected to last at least twelve months.  (Tr. 747.)  He identified depression, anxiety, and bipolar disease as the psychological conditions affecting Plaintiff's physical condition.  (*Id.*)  He then opined that Plaintiff would likely be off task 20% of an eight-hour work day and was incapable of even "low stress" jobs.  (*Id.*)  He further opined that Plaintiff could walk half a block without rest or severe pain; she could sit for 15 minutes and stand for 15 minutes at one time; she could sit for two hours and stand/walk for two hours total in an eight-hour workday; she would

_____

[6] It appears that page four of this Questionnaire is missing from the record.

need to include periods of walking around every 60 minutes for five minutes each time; she needed a job permitting shifting positions at will and she needed to take unscheduled breaks about every hour for five to ten minutes.  (Tr. 747-49.)  Dr. Choisser concluded that these limitations applied since February 24, 2011.  (Tr. 748.)

### 3.    State Agency Non-Examining Consultants

### a.    Michelle Butler, Psy.D.

On December 20, 2014, Dr. Butler completed a PRT form, opining, *inter alia*, that Plaintiff had moderate difficulties in social functioning and in concentration, persistence, or pace.  (Tr. 91.)  The same day, Dr. Butler also completed a Mental RFC Assessment, in which she opined, in part, that Plaintiff was moderately limited in the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers.  (Tr. 94-96.)  She explained that these limitations were due to Plaintiff's bipolar disorder and borderline personality disorder, which would allow Plaintiff to "cooperate with others for brief periods" of time.  (Tr. 95.)  Dr. Butler also stated:

> Claimant has the ability to understand and remember simple and
> detailed instructions.
> . . .
> Claimant has the ability to maintain attention and concentration for
> periods of at least two hours duration.  Claimant may have
> occasional interruptions from psychologically based symptoms, but
> has the ability to complete a normal workday and work week without

an unreasonable number and length of rest periods.
. . .
Claimant has the ability to relate appropriately to peers and
supervisors for brief periods[.]

(Tr. 95-96.)

### b. Sally Rowley, Psy.D.

On May 4, 2015, Dr. Rowley completed a PRT form, assessing moderate

difficulties in social functioning. (Tr. 133.) The same day, Dr. Rowley also

completed a Mental RFC Assessment. (Tr. 137-38.) The doctor opined that

Plaintiff was moderately limited in the ability to interact appropriately with the

general public, the ability to accept instructions and respond appropriately to

criticism from supervisors, and the ability to get along with coworkers or peers.

(*Id.*) Dr. Rowley repeated the following statements from Dr. Butler's assessment:

Claimant has the ability to understand and remember simple and
detailed instructions.
. . .
Claimant has the ability to maintain attention and concentration for
periods of at least two hours duration. Claimant may have
occasional interruptions from psychologically based symptoms, but
has the ability to complete a normal workday and work week without
an unreasonable number and length of rest periods.
. . .
Claimant has the ability to relate appropriately to peers and
supervisors for brief periods[.]

(Tr. 138.)

### c. P.S. Krishnamurthy, M.D.

On May 17, 2015, Dr. Krishnamurthy completed a Physical RFC

Assessment, opining, *inter alia*, that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk six hours and sit six hours in an eight-hour workday; should never climb ladders/ropes/scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could frequently climb ramps/stairs; should avoid concentrated exposure to extreme cold, heat, wetness, fumes, odors, dusts, gases, etc.; and should avoid even moderate exposure to vibration and hazards. (Tr. 134-36.) With respect to activities of daily living, Dr. Krishnamurthy stated:

> Claimant is able to get out of bed, shower, and dress without assistance. Claimant is able to button buttons, zip zippers, turn doorknobs and tie shoes without difficulty. Claimant is able to cook simple meal[s]. Claimant is able to lift a gallon of milk independently with each arm. Claimant is able to do all household chores including laundry, sweeping, and mopping. Claimant is able to grocery shop without assistance. Claimant does not use an assistive device for ambulation.

(Tr. 136-37.)

### D. Analysis

Plaintiff's first argument is that the ALJ improperly elected to rely on the opinion of the State agency non-examining physician, Dr. Krishnamurthy, as to Plaintiff's physical RFC and to reject the opinions of her treating physician, Dr. Braeutigam, and the examining consultant, Dr. Choisser. Plaintiff points out that Dr. Krishnamurthy reviewed only about 65 pages of treatment records, mentioned only two examinations from January 2015, and was not aware of the MRI results,

the injections, or the numerous pain management office visits. Plaintiff also argues that the ALJ failed to articulate good cause for rejecting Dr. Braeutigam's opinion given its consistency with Dr. Choisser's very detailed opinion, examination, and his review of the medical records. Plaintiff points out that the ALJ failed to adequately reconcile his own RFC assessment with Dr. Choisser's opinion and abnormal examination findings.

The Court agrees with Plaintiff that the ALJ's evaluation of the medical opinion evidence warrants a remand. The ALJ gave "great weight" to Dr. Krishnamurthy's opinion because it was "consistent with the examination findings showing normal strength and sensation, and full range of motion of the extremities, as well as with the claimant's course of treatment."[7] (Tr. 25.) However, the course of Plaintiff's treatment was filled with cervical trigger point injections and lumbar facet joint ablations or nerve blocks (Tr. 482-83, 487-89, 494, 500, 510, 516, 518, 524-26, 537, 544, 546, 574, 577-78, 581, 586, 602, 607, 610, 618, 626, 638), a variety of pain medications, such as Methadone, Norco, and Hydrocodone (*see, e.g.*, Tr. 454, 531, 552, 566), and numerous pain management office visits (*see, e.g.*, Tr. 429-41, 467-80, 492-93, 498, 542, 548,

---

[7] The ALJ imposed additional limitations as follows: "[I]n light of [Plaintiff's] knee osteoarthritis, neuropathy, and obesity, the undersigned further finds that she should only occasionally operate foot controls. In light of her cervical disc disease, the undersigned finds that she should only occasionally reach overhead, frequently handle, finger, and feel, and occasionally operate hand controls. Due to her combination of impairments, the undersigned finds that she requires a sit/stand option." (Tr. 25.)

558, 701-02, 709).  In fact, a progress note from Coastal Spine & Pain Center,

dated August 22, 2014, states that Plaintiff has "previously failed conservative

therapy," including medications and ice/heat treatment, and that her previous

facet joint nerve block gave more than 70 percent *transient* relief.  (Tr. 508

(emphasis added); *see also* Tr. 583 ("[Patient] reports relief for an hour on the left

side of [a facet joint nerve block].  The [right facet joint nerve block at] L3-S1 gave

50% relief for a few days.  The left side is still having pain").)  A number of these

progress notes also provide that in light of the chronic nature of Plaintiff's

condition, she would likely need to continue with the pain medications for a "long

period of time."  (*See, e.g.*, Tr. 532, 543, 553.)

Further, while the ALJ noted examination findings showing normal strength

and sensation, and full range of motion of the extremities (Tr. 25), the ALJ

omitted the positive examination findings, including reduced range of motion of

the cervical and lumbar spine, tenderness in the spine, tenderness in the knees,

painful range of motion of the knees, positive straight leg raising test, positive

Tinel's test over the occipital nerve, positive Spurling manuever, antalgic gait,

muscle spasm and stiffness, "sensation with diffuse hyperalgesia at every contact

point[,] including points not associated with fibromyalgia," "hyperalgesia of the

plantar right foot diffusely," etc.[8]  (*See, e.g.*, Tr. 416-17, 456-58, 486-87, 493,

---

[8] The ALJ mentioned the "reduced and painful cervical and th[o]racolumbar
range of motion," but emphasized that Plaintiff "retained normal strength, normal
(continued...)

498-99, 508, 513, 523-24, 542-43, 549, 553, 558-59, 562, 566-67, 576-77, 647-48, 745.)  Although an ALJ is not required to refer to every piece of evidence in his decision, the ALJ may not ignore relevant evidence, particularly when it supports the claimant's position.  *See, e.g.*, *Lord v. Apfel*, 114 F. Supp. 2d 3, 13 (D.N.H. 2000); *Meek v. Astrue*, 2008 WL 4328227, *1 (M.D. Fla. Sept. 17, 2008) ("Although an ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision . . . . Rather, the judge must explain why significant probative evidence has been rejected.") (internal citations and quotation marks omitted).[9]

In addition, Dr. Krishnamurthy apparently did not review a large part of the record prior to rendering the opinion, including the diagnostic test results.  For example, the MRI of the lumbar spine from June 17, 2013 showed: "Degenerative changes at L4-S1, most severe at L4/L5 with associated grade 1 anterolisthesis and facet arthropathy/facet effusions . . . ."  (Tr. 572.)  The MRI of the cervical spine from June 17, 2013 showed a "[s]mall posterior disc osteophyte complex at C5/C6 with mild spinal canal narrowing with mild facet arthropathy at C7-T1."  (Tr. 569-70.)  Also, the knee X-rays from February 2, 2015 showed tricompartmental

---

[8](...continued)
coordination, and normal sensation," and full range of motion of the extremities  (Tr. 24.)

[9] Although some of the positive examination findings were cited throughout the ALJ's discussion of the medical evidence, it appears that they were not considered in his evaluation of the medical opinions.

degenerative changes in both knees. (Tr. 695.) As Plaintiff points out, Dr. Krishnamurthy did not see these findings or the pain management records showing multiple injections and ongoing pain management. The Court can only speculate whether Dr. Krishnamurthy's opinion would have been the same if the complete medical record had been reviewed.

This is significant because the ALJ decided to give little weight to the opinions of the treating physician and the examining physician, both of whom had a more complete picture of the record. Dr. Braeutigam treated Plaintiff for years before completing the Physical RFC Questionnaire in 2016. Although Dr. Choisser was only an examining physician, he also reviewed a number of medical records prior to issuing his opinions in 2017. These records included: Dr. Knox's June 2013 and December 2014 reports; Dr. McCormick's September 2013 report; the record from Shands Jacksonville dated April 14, 2014; the records from Family Medical and Dental for the period January 7, 2013 to July 11, 2014; Dr. Martin's January 5, 2015 report; the records from Family Medical Center Middleburg for the period January 7, 2013 to January 20, 2015; the records from Coastal Spine and Pain Center for the period June 17, 2013 to February 9, 2015; the records from Clay Behavioral Health Center for the period February 12, 2016 to March 11, 2016; the records from St. Vincent's Center Clay County for the period February 2, 2015 to March 12, 2016; Dr. Menges's records from June 21, 2016 and July 15, 2016; and Dr. Braeutigan's records from June 1, 2015 to June

27, 2016 and August 8, 2016.  (Tr. 744.)

Further, the ALJ's reasons for discounting the opinions of Dr. Braeutigam and Dr. Choisser are not supported by substantial evidence.  The ALJ gave little weight to Dr. Braeutigam's opinion in the Physical RFC Questionnaire, in part, because it was inconsistent with Plaintiff's course of treatment.  First, it is not entirely clear what the ALJ meant by this statement.  To the extent the ALJ implied that the treatment was conservative, as shown above, this is not supported by substantial evidence.[10]  The ALJ also pointed to certain unremarkable examination findings to discount Dr. Braeutigam's opinion.  However, as shown above, the ALJ's decision to concentrate on a few unremarkable findings, while disregarding the positive examination findings, was improper.

The ALJ also stated that Dr. Braeutigam's treatment notes were largely illegible.  While it is true that some of the doctor's handwritten notes are difficult to read, his Physical RFC Questionnaire is legible.  The ALJ found Dr. Braeutigam's opinions to be inconsistent with "the physical examination finding contained in the entire record."  (Tr. 25.)  Although it is unclear which particular "finding" the ALJ referenced, as shown above, there are significant positive findings on

---

[10] There was only one time that Plaintiff was not receiving pain management during an extended trip to Kentucky.  (Tr. 498, 508.)  Prior to leaving, Plaintiff advised her medical providers of her upcoming trip, during which closer monitoring would not be possible, and they decided to "wean [her] current medical regimen."  (Tr. 596.)

examination throughout the record.  As such, the ALJ's reasons for discounting Dr. Braeutigam's opinions are either unclear or unsupported by substantial evidence.

Similarly, the ALJ gave little weight to Dr. Choisser's opinion, in part, because "the examinations of record" did not warrant a limitation of sitting two hours a day and standing/walking two hours a day.  (*Id.*)  However, in light of the ALJ's selective recitation of the examination findings in considering the opinion evidence, it is unclear whether the ALJ considered the totality of the examination reports.  Further, to the extent the ALJ stated that Dr. Choisser's own examination of Plaintiff did not warrant a limitation of sitting two hours a day and standing/walking two hours a day, it is unclear whether the ALJ considered the positive examination findings recorded by Dr. Choisser.  These included: limited cervical rotation, extension, and flexion; reduced hip flexion; limited back flexion and squat; positive straight leg raising test; and lack of reflexes in the right leg.  (Tr. 745-46.)  Again, Dr. Choisser's opinions were based not only on his personal examination and observations, but also on a review of the records and opinions listed earlier.  Based on the totality of this evidence, Dr. Choisser opined that Plaintiff could walk half a block without rest or severe pain; she could sit for 15 minutes and stand for 15 minutes at one time; she could sit for two hours and stand/walk for two hours total; she would need to include periods of walking around every 60 minutes for five minutes each time; she needed a job permitting

shifting positions at will; and she needed to take unscheduled breaks about every hour for five to ten minutes. (Tr. 747-49.)

In the decision, the ALJ also notes that although Plaintiff was referred for physical therapy, she did not follow up on that recommendation. (Tr. 24.) While the record indicates that Plaintiff "will be referred to [physical therapy] of the [lumbar] spine," it does not appear that Plaintiff was actually referred to physical therapy. (Tr. 559; *see also* Tr. 553-54.) It appears that her medical providers were moving away from conservative treatment options toward cervical trigger point injections and lumbar facet joint ablations or nerve blocks in an attempt to alleviate her symptoms and reduce the intake of opioid medications.

Based on the foregoing, the Court cannot conclude that the ALJ's evaluation of the opinion evidence from Dr. Braeutigam, Dr. Choisser, and Dr. Krishnamurthy is supported by substantial evidence. Thus, this case will be remanded with instructions to the ALJ to re-consider the opinions of these doctors, explain what weight they are being accorded, and the reasons therefor. In light of this conclusion and the possible change in the RFC assessment, it is unnecessary to address Plaintiff's arguments regarding her mental limitations and, specifically, the ALJ's evaluation of the opinions of Dr. Menges and Dr. Knox. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882,

884 (11th Cir. 1990) (per curiam).

Accordingly, it is **ORDERED**:

1.      The Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ: (a) to re-consider the medical opinions of record, particularly the opinions of Dr. Braeutigam, Dr. Choisser, and Dr. Krishnamurthy, explain what weight they are being accorded, and the reasons therefor; (b) to re-evaluate Plaintiff's RFC assessment, if necessary; and (c) to conduct any further proceedings deemed appropriate.

2.      The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.      In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on March 25, 2019.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record